# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Civil No. 23-216 |
| | ) | |
| NEAL ROBERT BLOUNT | ) | |

### Opinion on Motion to Dismiss Indictment

Defendant Neal Robert Blount is charged with two counts of violating the Military Extraterritorial Jurisdiction Act (MEJA), 18 U.S.C. § 3261(a)(1), by way of engaging in inappropriate sexual contact with a minor, outside the United States, as proscribed by 18 U.S.C. § 2244(a)(5) and § 2241(c). Presently before the Court is Mr. Blount's Motion to Dismiss the Indictment. Mot. Dismiss, ECF No. 38. In his Motion, Mr. Blount argues that 18 U.S.C. § 3261(a)(1), or MEJA(a)(1), is unconstitutional on its face, and unconstitutional as applied to Mr. Blount. The government filed a Response in opposition to the Motion to Dismiss, to which Mr. Blount filed a Reply. ECF Nos. 47 & 49. On May 1, 2024, oral argument on the Motion to Dismiss the Indictment was held. Following careful review of the parties' briefs, their oral arguments, and the applicable law, Defendant's Motion to Dismiss the Indictment will be denied.

## I.  The Military Extraterritorial Jurisdiction Act (MEJA)

Section 3261(a)(1) of Title 18, an act known as the Military Extraterritorial Jurisdiction Act (MEJA), is titled: "Criminal offenses committed by certain members of the Armed Forces and by persons employed by or accompanying the Armed Forces outside the United States." The text of § 3261(a)(1) provides, in relevant part, as follows:

> (a) Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States--

(1) while employed by or accompanying the Armed Forces outside the
United States;

. . .

shall be punished as provided for that offense.

18 U.S.C. § 3261(a)(1).  Mr. Blount is alleged to have engaged in conduct that would constitute

the underlying offenses set forth in 18 U.S.C. § 2244(a)(5) and § 2241(c), while he was

"accompanying the Armed Forces outside the United States;" specifically, while he was in

Japan.  Both of the underlying substantive offenses are "punishable by imprisonment for more

than 1 year if the conduct had been engaged in within the special maritime and territorial

jurisdiction of the United States."  18 U.S.C. § 3261(a).  In Count One, Mr. Blount is charged as

follows:

> In or around April 2018, in Okinawa, Japan, the defendant, NEAL
> ROBERT BLOUNT, did knowingly engage in, and attempt to engage in, sexual
> contact and cause sexual contact, as defined in Title 18, United States Code,
> Section 2246(3), that is: by intentionally touching, through the clothing, the
> breast, buttocks, and genitalia of another person, Victim 1, whose identity is
> known to the grand jury, who had not attained the age of twelve (12) years, with
> the intent to abuse, humiliate, harass, degrade, and arouse and gratify the sexual
> desire of any person, an offense punishable by imprisonment for more than 1 year
> if the conduct had been engaged in within the special maritime and territorial
> jurisdiction of the United States, to wit: an offense punishable by any term of
> years or for life, in violation of Title 18, United States Code, Section 2244(a)(5).
> In violation of Title 18, United States Code, Section 3261(a)(1 ).

Indictment, ¶ 6.  In Count Two, he is charged as follows:

> In or around April 2018, in Okinawa, Japan, the defendant, NEAL
> ROBERT BLOUNT, did knowingly attempt to engage in a sexual act, as defined
> in Title 18, United States Code, Section 2246(2), with a child, Victim 1, whose
> identity is known to the grand jury, who had not attained the age of twelve (12)
> years, an offense punishable by imprisonment for more than 1 year if the conduct
> had been engaged in within the special maritime and territorial jurisdiction of the
> United States, to wit: such offense is punishable by not less than 30 years or for
> life, in violation of Title 18, United States Code, Section 2241(c). In violation of
> Title 18, United States Code, Section 3261(a)(1 ).

Indictment, ¶ 8.

Mr. Blount challenges Congress's statutory and constitutional power and authority to enact a statute, like MEJA(a)(1), that extends the jurisdictional reach of the United States Criminal Code to a civilian "employed by or accompanying the Armed Forces *outside the United States*." 18 U.S.C. § 3261(a)(1) (emphasis added).  First, he argues that, where the underlying substantive criminal statute does not itself contain an explicit jurisdictional extraterritorial provision, the well-accepted presumption against applying statutes extraterritorially arises, which requires dismissal of the Indictment.  Second, Mr. Blount presents a facial challenge, arguing that Congress lacks the authority to create a single, "catch-all" statute like MEJA(a)(1),  that purports to apply all federal felony statues to a certain class of people living abroad.  Third, Mr. Blount argues that the statute is facially unconstitutional, because it is outside the scope of Congress's enumerated powers, it fails to limit jurisdiction, and it is unconstitutionally vague. Finally, Mr. Blount presents three related constructional challenges, focusing on the jurisdictional element present in numerous federal felony criminal statutes, including 18 U.S.C. § 2244(a)(5) and § 2241(c), which is the requirement that the offense conduct occur within the special maritime and territorial jurisdiction of the United States.  Mr. Blount's arguments will be addressed in turn.

## II.    Extraterritorial Application of Congressional Statutes

The defense argues that the Indictment must be dismissed, because the explicit and clear jurisdictional language of 18 U.S.C. § 2244(a)(5) and § 2241(c), requires that the statutes apply only within the special maritime and territorial jurisdiction of the United States.[1]  The

---

[1]  Both 18 U.S.C. § 2244(a)(5) and § 2241(c) require that the conduct occur "in the special maritime and territorial jurisdiction of the United States or in a federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency."  For purposes of the present Motion to Dismiss, the relevant phrase relied upon by the defense is, "in the special maritime and territorial jurisdiction of the United States."

Indictment, however, alleges that the offense conduct occurred outside the United States. Neither of the underlying substantive criminal statutes contain an extraterritorial jurisdictional provision. Case law is clear in stating that there exists a presumption against extraterritorial application of United States statutes, except when Congress has affirmatively and clearly expressed its intention that a statute is to be applied extraterritorially. *Krobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 120-21 (2013) ("When a statute gives no clear indication of an extraterritorial application, it has none."); *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) ("The question is . . . whether Congress has affirmatively and unmistakably instructed that the statute will" apply to foreign conduct). Since the underlying substantive offenses in this case do not apply extraterritorially, the defense argues that a presumption arises against applying said statutes extraterritorially. The defense argues that such presumption leads to the conclusion that the underlying criminal statutes must be only applied domestically; and therefore, the charges in the present Indictment must be dismissed.

The government acknowledges that the instant underlying criminal statutes do not contain language expressing an intention that either statute is to be applied extraterritorially. Said statutes require that the offense conduct occur within the special maritime and territorial jurisdiction of the United States. However, Mr. Blount is not charged with violating either § 2244(a)(5) or § 2241(c). Therefore, because the statute he is actually charged with violating, MEJA(a)(1), "unquestionably applies extraterritorially," the government concludes that Mr. Blount's argument fails. Gov. Resp. 11.

When analyzing a statute's reach, courts are to apply a presumption against extraterritorial application of Congressional statutes. *Krobel*, 569 U.S. at 120-21. The starting point for such analysis is to identify the subject statute. The defense asks the Court to analyze

extraterritorial reach of the two underlying statutes, 18 U.S.C. § 2244(a)(5) and § 2241(c).  The government identifies MEJA(a)(1) as the proper statute for analysis.  Were the Court considering an indictment charging Mr. Blount with violating only 18 U.S.C. § 2244(a)(5) and § 2241(c), while he was in Japan, the Court would agree that neither statute could or would apply extraterritorially to reach Mr. Blount's wholly foreign conduct.  In this case, however, the statute that Mr. Blount is alleged to have violated is MEJA(a)(1).  The underlying criminal statutes, § 2244(a)(5) and § 2241(c), are referenced in the Indictment to describe the prohibited conduct alleged to have been violated.  In MEJA(a)(1), Congress affirmatively and expressly instructed that this statute applies to "conduct outside the United States."  18 U.S.C. 3261(a)(1).  Analyzing extraterritorial application to the charges in this case requires consideration of MEJA(a)(1), because that is the statute that Mr. Blount is alleged to have violated.  The defense's argument does not support the conclusion that MEJA(a)(1) lacks extraterritorial application.

Further, MEJA was drafted with the specific intent that it was enacted as a new crime. When drafting MEJA, there was discussion as to whether Congress "was enacting a new crime or simply extending the reach of all existing federal crimes to persons accompanying the military overseas."  Glenn R. Schmitt, *Closing the Gap in Criminal Jurisdiction over Civilians Accompanying the Armed Forces Abroad - A First Person Account of the Creation of the Military Extraterritorial Jurisdiction Act of 2000*, 51 CATH. U. L. REV. 55, 115 (Fall 2001).  Ultimately, MEJA was adopted to establish a new crime.  *Id.* at 78-79, 115.  The drafters analogized MEJA to the Federal Assimilative Crimes Act; specifically, they  referred to the prosecution of "minor crimes on military reservations for which there is no corresponding federal statute."  *Id.* at 115.  In such cases, the charging document would allege a violation of the Federal Assimilative Crimes Act, while also referring to the particular state

statute proscribing the conduct that had been allegedly violated and "assimilated" under the

Federal Assimilative Crimes Act. *Id.* "However, it was understood that the offense charged was

a federal offense under the Title 18 section and not a violation of the state statute." *Id.* The

"practice of referencing the 'assimilated' state crime was done merely to put the defendant and

the court on notice as to what the government planned to prove at trial." *Id.* Thus, the

Department of Defense representatives and the MEJA drafters agreed, "that prosecutions under

[MEJA] would be for violations of that section and not for violations of any other Title 18

section referenced in the charging document." *Id.*

Because the statute that Mr. Blount is alleged to have violated, *i.e.*, MEJA(a)(1),

explicitly provides that it applies extraterritorially, the defense's argument, that the absence of

express extraterritorial jurisdictional language within the underlying criminal statutes at issue

herein, is not germane to the question of whether MEJA(a)(1) applies extraterritorially in this

case. There is simply no presumption to the contrary in the face of MEJA(a)(1)'s clear statutory

language. Here, on its face, MEJA(a)(1) expressly applies to Mr. Blount's alleged

extraterritorial conduct.

### III.    Congress's Authority to Enact a MEJA-"Catch-All" Jurisdictional Statute

The defense next argues, as a facial challenge, that there is no legal authorization

permitting Congress to enact a single, all-encompassing "catch-all" statute that purports to

provide extraterritorial application to all felony federal criminal offenses under the United States

Criminal Code. *See* Def. Mot. Dismiss 8 (the "law is  devoid of any authority of Congress to

provide extraterritorial application to almost the entire federal criminal code in one sweeping

statute.") Mr. Blount argues that Congress must expressly provide, within the language of each

felony federal criminal statute, a clear indication that such statute is subject to extraterritorial

application.  *Id.* (extraterritorial jurisdiction must be statute-specific, tied to the substantive

offense, and be clearly stated).  The defense argues that, because an allegation of a violation of

MEJA(a)(1) requires that the charging document refer to, and rely upon, a separate underlying

criminal statute to describe the criminal conduct at issue, MEJA(a)(1) only "confer[s]

extraterritorial jurisdiction to the same extent as the offenses that underlie [it]."  *Id.* (citing

*United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002)).

The defense argues that the underlying criminal statutes must be examined to determine

extraterritorial reach by analogizing to so-called ancillary statutes, such as aiding and abetting

and conspiracy.  When a defendant is charged with an offense of "aiding and abetting" or an

offense of "conspiracy," the charge necessarily attaches to a separate substantive criminal

offense, such as, aiding and abetting *money laundering* and conspiracy *to possess with intent to*

*distribute controlled substances*.  Such ancillary statutes do not contain their own extraterritorial

application language; therefore, a court must look to the underlying substantive offense when

determining the extraterritorial application for the charged offense.  Def. Mot. Dismiss 7.  The

ancillary statutes are deemed to have extraterritorial effect only to the extent that the underlying

substantive statutes have extraterritorial application.  *Id.* (citing *United States v. Belfast*, 611 F.3d

783, 814 (11th Cir. 2010) and citing *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002);

*United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991); *United States v. Felix–Gutierrez*,

940 F.2d 1200, 1204–05 (9th Cir.1991)).  The defense argues that MEJA(a)(1) functions like an

ancillary statute,  in that, when MEJA(a)(1) is charged, by its statutory terms, it attaches to an

underlying substantive offense.  Therefore, the defense concludes that MEJA(a)(1) only confers

extraterritorial jurisdiction to the extent that the underlying offense prescribes extraterritorial

jurisdiction.  Thus, the defense argues that because the underlying offenses here, 18 U.S.C. §

2241(c) and § 2244(a)(5), do not confer extraterritorial jurisdiction, neither can MEJA(a)(1).

In response, the government argues that Mr. Blount fails to identify a legal source to support his argument, that Congress must provide for extraterritorial application on a statute-by-statute basis.  The government also argues that Mr. Blount's argument by analogy to ancillary statutes is distinguishable in the present case, because, unlike the ancillary statutes cited by Mr. Blount, MEJA(a)(1) expressly provides for its extraterritorial application.

"A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citation omitted).  "A party asserting a facial challenge 'must establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (*en banc*) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Here, Mr. Blount argues that Congress lacks authority to enact MEJA(a)(1) as a "catch-all" statute in the first place; therefore, he argues that MEJA(a)(1) is invalid in all cases.

When analyzing the extraterritorial application of a criminal statute, a court looks to the precise language in the statute to determine its extraterritorial reach, if any.  The defense argues that analysis of the extraterritorial application of MEJA(a)(1) requires an examination of the extraterritorial reach stated within the text of each underlying substantive statute.  The government argues that analysis of the extraterritorial application of MEJA(a)(1) requires an examination of MEJA(a)(1).

MEJA(a)(1), which is described by its drafters as an assimilative statute, does contain an express,  specific and clear provision that confers extraterritorial jurisdiction.  For MEJA(a)(1) offenses, there is no need to rely upon any underlying substantive criminal offense to obtain extraterritorial jurisdiction and application, because MEJA(a)(1) itself provides for

extraterritorial jurisdiction. Unlike MEJA(a)(1), ancillary statutes do not have an independent provision for extraterritorial jurisdiction; therefore, the only source for such jurisdiction, when an ancillary crime is charged, must come from the underlying substantive offense.

Further, as explained above, MEJA was drafted and enacted as a crime in and of itself; it is not an ancillary crime. Schmitt, *Closing the Gap in Criminal Jurisdiction*, 51 CATH. U. L. REV. at 78-79, 115. Thus, a prosecution under MEJA is a prosecution for a MEJA crime; it is not a criminal prosecution for violations "of any other Title 18 section referenced in the charging document." *Id.* at 115. Like an offense brought pursuant to the Federal Assimilative Crimes Act, an indictment charging a violation of MEJA will necessarily refer to conduct as defined within an underlying substantive offense. Reference to the underlying substantive offense conduct puts the defendant and the court on notice as to what the government must prove at trial. However, the alleged offense at issue is the violation of MEJA(a)(1); it is not solely based upon the underlying substantive statute referenced in the indictment. Because MEJA contains its own explicit extraterritorial language, and because MEJA is a separate offense, ancillary statute analysis for extraterritorial jurisdiction does not apply to MEJA criminal prosecutions.

In addition, the defendant's argument that extraterritorial jurisdiction must be statute-specific and tied to the substantive offense is not directly on point. Extraterritorial application of MEJA(a)(1) does not depend upon any other substantive statute to define the jurisdictional basis. MEJA(a)(1) expressly legislates the parameters to confer extraterritorial application. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 258 (1991).

The defense next cites to cases that address a single statute that provides for extraterritorial application for some subsections of the statute, but not for others. Mot. Dismiss 9 (citing *RJR Nabisco, Inc.*, 579 U.S. 325 (2016) (addressing the RICO statute) and *United States*

*v. Oral George Thompson*, 921 F.3d 263 (D.C. Cir. 2019) (addressing the crimes set forth in 21 U.S.C. § 959)).  With respect to 21 U.S.C § 959, titled "Possession, manufacture, or distribution of controlled substance," it was determined by the D.C. Circuit that Congress drafted the statute so that the offenses of <u>distribution</u> and <u>manufacture</u> apply extraterritorially, but that the offense of <u>possession with intent to distribute</u> does not apply extraterritorially.  *Oral George Thompson*, 921 F.3d 263.  This conclusion is supported by the explicit language of section 959, which specifies the precise offenses that have extraterritorial application, to wit:

> (d) **Acts committed outside territorial jurisdiction of United States.**  This section is intended to reach acts of *manufacture* or *distribution* committed outside the territorial jurisdiction of the United States.

21 U.S.C. § 959(d) (emphasis added).  Congress did not include the offense of "possession with intent to distribute" within the extraterritoriality subsection of § 959(d).  Thus, Congress clearly defined the extraterritorial reach of its respective legislation.

Mr. Blount argues that, if MEJA(a)(1) is applied to an underlying substantive offense, such as 21 U.S.C. § 959, it would ostensibly confer extraterritorial application and jurisdiction to a substantive offense (possession with intent to distribute) where Congress expressly did not confer such extraterritorial application.  There are two responses to this argument.  First, MEJA(a)(1) is a separate federal offense, and it expressly provides for extraterritorial jurisdictional application for MEJA(a)(1) offense conduct, which is described by reference to an underlying substantive offense, such as possession with intent to distribute, as prohibited by 21 U.S.C. § 959.  Second, by enacting MEJA(a)(1), Congress intended to provide for extraterritorial jurisdiction for criminal offense conduct (even for the offense of possession with the intent to distribute), *when* such conduct occurs "outside the United States" and "while [the alleged

offender was] employed by or accompanying the Armed Forces outside the United States."  18 U.S.C. § 3261(a)(1).

Finally, the defense argues that nonsensical results may occur if MEJA(a)(1) is charged in connection with certain offenses.  Mot. Dismiss 11-12.  The argument is understood to highlight the defense's position that Congress must explicitly provide for extraterritorial application within each specific statute.[2]  Separate from the prosecution of MEJA(a)(1), it is possible that a nonsensical result may occur under any number of federal criminal offenses, depending upon the operative facts.  Such possibilities do not render a statute unconstitutional.  Nor do they support the present challenge to Congress's authority to enact a statute like MEJA.  In any event, the Court declines to address the argument as presented, since, as applied to the MEJA(a)(1) offense charged and the underlying conduct in this case, there is no nonsensical result.

### IV.   Congress's Authority to Enact MEJA, the Jurisdictional Limits of MEJA, and Whether MEJA is is Unconstitutionally Vague?

Next, the defense presents a facial challenge to MEJA(a)(1), arguing that MEJA(a)(1) is outside the scope of Congress's enumerated powers, it fails to limit jurisdiction, and it is unconstitutionally vague.

---

[2] This argument also appears to concede that Congress does have the authority to enact separate, "MEJA-like," statutes for every federal felony criminal statute it wanted to so legislate.  Congress could take the description of the offense conduct and the penalties and, in enacting each new MEJA-like offense, Congress could ensure that the new statue applies "outside the United States," and to only certain offenders as described within the MEJA statute itself.  Presumably, while undertaking such a task, Congress could have chosen to skip any statute that it believed would result in a nonsensical result.  Furthermore, once it is conceded that Congress is authorized to enact individual MEJA-like mirror image criminal statutes for each federal felony offense, then there seems to be no impediment to Congress enacting a single global MEJA statute that, within the text of the statue, included a list identifying each federal felony criminal offense that would be violated if committed extraterritorially by a certain defined class of persons.  Finally, the next obvious step would be for Congress to enact a single statute, referring to a defined class of prohibited felony conduct, (*i.e.*, conduct "that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States"), which is what Congress did in enacting MEJA.

### A.  Congress's Enumerated Powers Authority

The defense begins with a thorough recitation of case law, and other sources, articulating the limits on Congress's authority to reach conduct extraterritorially.  Mot. Dismiss 13-20. From that base, the defense argues that Congress may not exceed its Constitutional authority when enacting statutes that purport to apply extraterritorially.  *See, e.g.*, Mot. Dismiss 19 ("congressional power abroad is not unfettered, and must be tied to an enumerated power, even if a court views congressional power to be broader overseas").  The defense argues that MEJA(a)(1) is not rooted in any enumerated Constitutional power.  In support of passing MEJA, the House of Representatives Committee Report stated that the Constitutional authority for enactment of MEJA is found "in Article I, section 8, clauses 10, 14, 16, and 18 of the Constitution."  H.R. REP. 106-778, 14.  According to the defense, however, the above-cited Constitutional provisions, neither alone nor in combination, provide Congress with the authority to enact the MEJA legislation at issue.

In response, the government first argues that Article I analysis, to determine Congress's authority to enact the legislation, is unnecessary.  The government points out that Courts have historically upheld the authority of Congress to enact and enforce United States criminal laws extraterritorially.  Gov. Resp. 15-16 (citing cases).  The government argues that Congress has the power to enact legislation, based upon its exercise of its authority over external affairs.  Gov. Resp. 16-17 (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315-16 (1936)). Alternatively, the government maintains that Article 1, Section 8, clauses 12-14 (the Military Clauses), as supported by Article 1, Section 8, clause 18 (Necessary and Proper Clause) also authorizes and validates MEJA(a)(1)'s enactment.  In support, the government cites several cases

that relied upon said clauses to uphold the constitutional power of Congress to enact valid extraterritorial legislation.

As cited by the government, the longstanding *Curtiss-Wright* Supreme Court decision recognized that Congress has the power and authority, separate from Article I's enumerated powers, to enact legislation affecting external affairs. *Curtiss-Wright*, 299 U.S. 304. In said decision, the Supreme Court "first consider[ed] the differences between the powers of the federal government in respect of foreign or external affairs and those in respect of domestic or internal affairs." *Id.* at 315. Such differences, the Supreme Court stated, are "fundamental." *Id.* The Supreme Court explained the basic principle of the federal government's domestic powers, vis-à-vis state powers, as follow:

> The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true *only in respect of our internal affairs*. In that field, the primary purpose of the Constitution was to carve from the general mass of *legislative powers then possessed by the states* such portions as it was thought desirable to vest in the federal government, leaving those not included in the enumeration still in the states.

*Id.* at 315-16 (emphasis added).

Turning to federal legislative power with respect to external affairs, the Supreme Court observed that, "the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source." *Id.* The powers were transmitted to the United States, the Supreme Court explained, by way of the "colonies, acting as a unit," upon separating from Great Britain. *Id.* The "powers of external sovereignty passed from [Great Britain] not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America." *Id.* The Supreme Court further explained that, "[e]ven before the Declaration, the

colonies were a unit in foreign affairs, acting through a common agency—namely, the Continental Congress, composed of delegates from the thirteen colonies. That agency exercised the powers of war and peace, raised an army, created a navy, and finally adopted the Declaration of Independence." *Id.* In a later case, the Supreme Court similarly explained that, "[a]lthough there is in the Constitution no specific grant to Congress of power to enact legislation for the effective regulation of foreign affairs, there can be no doubt of the existence of this power in the law-making organ of the Nation. *Perez v. Brownell*, 356 U.S. 44, 57 (1958), overruled on other grounds by *Afroyim v. Rusk*, 387 U.S. 253 (1967).

Courts, addressing whether MEJA was properly enacted by Congress, have relied upon *Curtiss-Wright*, and the logical inference that the federal government has inherent sovereign foreign powers, to conclude that MEJA was properly enacted. *United States v. Williams*, 722 F. Supp. 2d 1313, 1317-18 (M.D. Ga. 2010) (legislative limitations of Constitutionally enumerated powers do not apply externally, and thus Congress had authority to enact MEJA)); *United States v. Plummer*, 221 F.3d 1298, 1304 (11th Cir.2000) ("Congress unquestionably has the authority to enforce its laws beyond the territorial boundaries of the United States"); *United States v. Skaggs*, 327 F.R.D. 165, 169–70 (S.D. Ohio 2018) (agreeing with the *Williams* Court, 722 F.Supp.2d at 1318, that "MEJA was properly promulgated pursuant to Congress' 'expansive extraterritorial' authority"). *United States v. Brehm*, No. 1:11-CR-11, 2011 WL 1226088, at *6 (E.D. Va. Mar. 30, 2011) ("the authority of Congress to legislate with respect to affairs external to the boundaries of the United States is based on national sovereignty in foreign affairs and, therefore, is not limited by the enumerated powers delegated to Congress in Article 1, Section 8"), affirmed on ground that MEJA was constitutional based on Congress's enumerated powers, *United States v. Brehm*, 691 F.3d 547, 551 (4th Cir. 2012). This Court agrees with the above authorities and

14

finds that Congress properly enacted MEJA pursuant to its inherent and broad extraterritorial authority.

In addition, Congress also had the power to enact MEJA pursuant to the Constitution's enumerated powers.  In *United States v. Brehm*, the Fourth Circuit Court of Appeals concluded that MEJA was constitutionally enacted pursuant to Congress's legislative power conferred by Article I, Section 8 of the Constitution.  *Brehm*, 691 F.3d at 551.  The Fourth Circuit explained as follows:

> Congress is entitled to "make all Laws which shall be necessary and proper" to adequately support our armed forces. U.S. Const. art. I, § 8, cl. 18; *see Rostker v. Goldberg*, 453 U.S. 57, 65, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (observing that congressional authority "to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping").  Armies, by their very nature, must be expected to operate in foreign lands, and their need for support does not end at our borders.

*Id.; see also United States v. Drotleff*, 497 F. App'x 357, 359 (4th Cir. 2012) (rejecting constitutional challenge to MEJA based on *Brehm* precedent).  In reaching this conclusion, the Fourth Circuit noted that Brehm, a foreign national working for a military contractor supporting the war effort in Afghanistan, engaged in criminal actions that "affected significant American interests at [Kandahar Airfield], not the least of which were the preservation of law and order on the base [and] the maintenance of military-related discipline."  *Id.*  at 552–53.

Further, in *United States v. Skaggs*, the District Court also concluded that MEJA was constitutional, as authorized by Congress's expansive extraterritorial authority and by the Constitution's enumerated powers.  *Skaggs*, 327 F.R.D. at 169–70.  The *Skaggs* Court held that MEJA was properly promulgated pursuant to Congress's "express authority under Article I to 'raise and support Armies,' and its general authorities to 'make all Laws which shall be necessary and proper' to support the military overseas."  *Skaggs*, 327 F.R.D. at 170 (citing

*Brehm*, 691 F.3d at 551).  This Court agrees, and finds that, Congress did not exceed its powers in enacting MEJA.  Said legislation was a valid exercise of Congress's expansive extraterritorial authority and its enumerated powers under Article I, Section 8 of the Constitution.

### B.  MEJA's and its Extraterritorial Jurisdictional Limits

Mr. Blount next argues that MEJA is facially invalid, because it is not limited to the recognized prerequisites for application of United States law abroad.  Specifically, Mr. Blount argues that MEJA "contains no element requiring that a defendant be a U.S. citizen, or that the conduct occur within the special maritime or territorial jurisdiction of the U.S. or on the high seas."  Mot. Dismiss 24 (citing 18 U.S.C. § 2339B(d)(1)[3]).  Mr. Blount argues that subsection 2339B(d)(1), titled "Extraterritorial jurisdiction," provides "a practical example that illustrates the limits of exterritorial reach [by] explicitly prescrib[ing] extraterritorial reach, [and] contain[ing] necessary limitations on its extraterritorial power related to authority abroad."  Def. Mot. Dismiss, at 20.  In his Reply Brief, Mr. Blount provides additional supporting authorities.  But he primarily relies upon limitations imposed upon extraterritorial application of statutes by the Due Process Clause.  Def. Reply Br. 15-16 (also citing limitations stated in the Fourth Restatement of Foreign Relations Law §§ 402-404).   Mr. Blount concludes his argument as follows:

> MEJA's requirement that the defendant be 'employed by or accompanying the Armed Forces outside the United States' [] is not a sufficient limitation to justify wholly foreign conduct that does not affect the armed forces. For example, MEJA(a)(1) would allow for the United States to prosecute a Canadian citizen who is married to a U.S. servicemember if she distributes marijuana in the Netherlands to a Dutch citizen while alone on a vacation there.[4] A law that

---

[3] 18 U.S.C. § 2339B provides for criminal prosecution of persons "Providing material support or resources to designated foreign terrorist organizations."

[4] Mr. Blount's hypothetical does not include the averment that the Canadian citizen spouse was in fact, "accompanying the Armed Forces outside the United States," at the time of the marijuana distribution,  and therefore met that element of MEJA.

would allow a prosecution for such wholly foreign conduct among foreign
citizens cannot be said to be within recognized limits for application of U.S. law
abroad.

*Id.* 15.  Defense counsel offered additional supporting legal authority at oral argument.  Tr., May

1, 2024, ECF No. 52, at 6-9.  Defense counsel's oral argument, at times, appeared to rely on Mr.

Blount's prior argument, addressed above in Section IV.A., in which it was argued that Congress

did not have the authority to enact MEJA.  *See Id.* at 8 (*e.g.*, "fixing a jurisdictional gap is just

not an enumerated power in Congress" and arguing that certain enumerated powers do not

support Congress's power to enact MEJA).

The government argues that MEJA is properly limited in that it reached only conduct

committed while a defendant was employed by or accompanying Armed Forces outside the

United States, or while a defendant was a member of the Armed Forces, but at the time of the

offense conduct, was no longer such a member.  Gov. Br. 20-21.  The government also points out

that 18 U.S.C. § 2339B(d)(1), the statute Mr. Blount uses as an example of properly limited

extraterritorial reach, reaches conduct occurring outside the United States, just like MEJA does.

Subsection (d)(1)(C) of § 2339B provides for extraterritorial jurisdiction over an offender who

commits the offense conduct if the "offender is brought into or found in the United States, *even if

the conduct* required for the offense *occurs outside the United States*."  18 U.S.C. §

2339B(d)(1)(C) (emphases added).  In addition, subsections (d)(1)(B)-(F) of § 2339B, do not

require that the offender be a United States citizen.

The Court finds that MEJA(a)(1) provides the following limitations to its reach and

application.  MEJA(a)(1) defines the <u>status</u> of a potential offender as a person who engages in

prohibited conduct, "while employed by or accompanying the Armed Forces outside the United

States."  18 U.S.C. § 3261(a)(1).  It also provides a <u>temporal qualifier</u>, in that the offensive

conduct must occur "while" the person is employed by or accompanying the Armed Forces.  *Id.*

MEJA defines <u>where</u> the conduct must occur in order to fall within the statute, which is, "outside

the United States."  *Id.*  MEJA further defines <u>the prohibited conduct</u>, albeit broadly, as conduct

"that would constitute an offense punishable by imprisonment for more than 1 year if the

conduct had been engaged in within the special maritime and territorial jurisdiction of the United

States."  *Id.*  Finally, MEJA provides that the <u>punishment</u> for engaging in prohibited conduct as

the punishment "as provided for" by the specific statute encompassing the alleged offensive

conduct committed by the person.  *Id.*   By virtue of these clearly defined legislative provisions,

MEJA complies with the Due Process Clause, does not improperly fail to limit jurisdiction, and

is therefore facially valid.

### C.  Vagueness

Section 3267 of Title 18 provides definitions for the MEJA.  Mr. Blount's vagueness

argument is narrowly focused on 18 U.S.C. § 3267(2)(C)'s definition of persons who do not fall

within the meaning of the MEJA term, "accompanying the Armed Forces outside the United

States."  Subsection 3672(2)(C) provides that a person who is "a national of or ordinarily

resident in the host nation," is not considered a person "accompanying the Armed Forces outside

the United States."  18 U.S.C. § 3267(2)(C).  Mr. Blount argues that "the word 'ordinarily' is

vague, with no distinct parameters on how long an individual had to reside in a particular place

for that residence to become "'ordinary.'"  Def. Mot. Dismiss  25.  The government argues that

the term "ordinarily" is not vague.  Gov. Resp. 22-23 (citing *United States v. Williams*, 836 F.3d

1 (D.C. Cir. 2016)).

"'A statute is void on vagueness grounds if it: (1) 'fails to provide people of ordinary

intelligence a reasonable opportunity to understand what conduct it prohibits'; or (2) 'authorizes

or even encourages arbitrary and discriminatory enforcement.'" *United States v. Amirnazmi*, 645 F.3d 564, 588 (3d Cir. 2011) (quoting *United States v. Stevens*, 533 F.3d 218, 249 (3d Cir. 2008)) (quoting *Hill v. Colorado*, 530 U.S. 703, 732, (2000)).

In order to establish that a defendant is properly charged under MEJA, the government must prove that the person committed the alleged offense, "while employed by or accompanying the Armed Forces outside the United States."  Looking to the definition provided in subsection 3267(2)(C), a defendant may raise the defense that he does not fall within the statute by claiming (and proving) that he is "ordinarily resident in the host nation."  In *United States v. Williams*, the defendant did argue that the government failed to establish that he was not a "national of" or "ordinarily resident in" Germany, at the time of offense conduct.  836 F.3d at 8.  The *Williams* Court found that the evidence was sufficient to prove that the defendant was not "ordinarily resident in" Germany, explaining as follows:

> we note that "ordinarily" means "usually." OXFORD ENGLISH DICTIONARY (2d ed. 1989). MEJA thus envisions that a person "accompanying the Armed Forces" in a host country resides in that country as a military dependent, but is not usually resident there. In other words, he lives there because of his connection to the military rather than because of other significant "local ties."

*Id.* at 8 (citation omitted).  The *Williams* Court explained that, under the MEJA definition, "an individual must have at least some significant ties to the host nation, outside of his connection to the military, to qualify as 'ordinarily resident.'"  *Id.* at 9.  *See also United States v. Martin*, 555 F. Supp. 3d 821, 827 (D. Ariz. 2021) (finding defendant was not ordinarily resident in Germany and citing *Williams*, 836 F.3d at 6).

The Court agrees with the *Williams* Court, that the term "ordinarily resident" refers, at a minimum, to someone who has significant ties to the host nation, separate from his connection to the military.  This definition of the phrase provides a person of ordinary intelligence with fair

warning of what conduct it prohibits – or under the challenged definition, of what it means to be "ordinarily resident" in a host nation.  To wit, the Court finds that a person of ordinary intelligence would know that there is a difference between accompanying the military as a dependent or contractor within a host nation, and maintaining significant local ties to the host nation, *separate from* one's status as accompanying the military.  A defendant may challenge that factual question, whether he was "ordinarily resident" in the host nation at the time of the offense conduct, at trial.  Therefore, the Court concludes that MEJA is not unconstitutionally vague.

## V.    Challenges to MEJA(a)(1) Based Upon the Presence of the Federal Jurisdiction Element in Underlying Felony Federal Criminal Offenses that the Offense Conduct Occur Within the Special Maritime and Territorial Jurisdiction of the United States

Mr. Blount's final three arguments focus on the jurisdictional element present in 18 U.S.C. § 2244(a)(5) and 2241(c) and numerous other felony federal criminal offenses, which is the requirement that the offense conduct occur within the special maritime and territorial jurisdiction of the United States.  In a limited facial challenge, he argues that MEJA(a)(1) is unconstitutional, when an indictment is brought based on an underlying substantive criminal offense that has, as its sole basis for federal jurisdiction, the special maritime and territorial jurisdiction of the United States.  He argues that no enumerated congressional authority supports application of § 2244(a)(5) and § 2241(c) when the offense conduct occurs on foreign soil.  Next, Mr. Blount argues that MEJA(a)(1) is unconstitutional *as applied*[5] to Mr. Blount, based upon his argument that Congress lacks authority to enact a statute that applies extraterritorially to the specific underlying substantive offenses in this case, to wit, 18 U.S.C. § 2244(a)(5) and §

---

[5] An as applied challenge contends that a law's "application to a particular person under particular circumstances deprived that person of a constitutional right."  *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citation omitted).

2241(c).  Finally, Mr. Blount argues that the government improperly relieves itself of proving the necessary jurisdictional element contained within the text of § 2244(a)(5) and § 2241(c), which is that the offense conduct occurs within the special or territorial jurisdiction of the United States.

The government argues that Mr. Blount's limited facial challenge is undeveloped and is a restatement of his prior argument that Congress lacks authority to apply MEJA to foreign conduct.  Gov. Resp. 23.  The government reiterates its position that "Congress has authority to criminalize conduct committed entirely outside the United States."  *Id.*  The government argues that Mr. Blount's "as applied challenge" is in fact a facial challenge similar to Mr. Blount's prior arguments, wherein he argues that Congress is without authority to enact a law that permits prosecution for conduct occurring outside the United States when the underlying statutes have no such extraterritorial application.  Gov. Resp. 23-24.  As to the final "jurisdictional element" argument, the government disagrees that, in this case, there is any requirement that it must prove that the alleged offense conduct occurred in the special maritime and territorial jurisdiction of the United States.  *Id.*

All three defense arguments turn on the presence of an underlying criminal statute's jurisdictional element, requiring that the offense conduct occurs within the special maritime and territorial jurisdiction of the United States.  Accordingly, all three arguments are resolved on the same reasoning.

The government has charged Mr. Blount with violating MEJA(a)(1), which requires that the defendant engaged in the alleged offensive conduct "outside the United States."  Naturally, there is no requirement in MEJA(a)(1) that the alleged offensive conduct occur within the special or territorial jurisdiction of the United States.  In fact, a MEJA prosecution can only be brought if the alleged offense conduct occurred "outside the United States," which necessarily means that

the conduct did *not* occur within the special maritime and territorial jurisdiction of the United States.

With respect to the presence of underlying substantive offenses in a MEJA indictment, as the Court previously explained, such an indictment will necessarily refer to conduct as defined within said underlying substantive offenses.  The offense conduct alleged in a  MEJA(a)(1) indictment is identified by reference to the precise definition set forth within the underlying statute at issue.  The indictment refers to the underlying substantive offense conduct in order to put the defendant on notice as to what the government must prove at trial.  However, as the Court has repeatedly stated, the alleged offense at issue is the violation of MEJA(a)(1).

MEJA contains its own explicit extraterritorial jurisdictional language.  With the enactment of MEJA(a)(1), Congress has properly conferred federal jurisdiction, and authorized prosecution for conduct proscribed in felony federal criminal offenses, when such  conduct occurs outside the United States and by a certain class of defined persons.  *United States v. Martin*, 555 F. Supp. 3d 821, 827 (D. Ariz. 2021) (Court finds that it had proper subject-matter jurisdiction under 18 U.S.C. § 3231, as the charge was an "offense against the laws of the United States" and "MEJA extended the reach of those offenses to [defendant's ] conduct in Germany. This is enough for subject-matter jurisdiction").  The Court finds that the jurisdictional language within an underlying criminal offense has no effect in a MEJA prosecution.  The Court, therefore, concludes that the MEJA(a)(1) charges filed against Mr. Blount, which necessarily refer to the proscribed conduct from sections § 2244(a)(5) and § 2241(c), are constitutional as applied to Mr. Blount.  The Court further finds that there is no requirement under MEJA(a)(1) that the government prove any jurisdictional element that is present within an underlying statute that references substantive offense conduct.  Finally, the Court concludes that it has jurisdiction

over this case by way of MEJA(a)(1).  *United States v. Slatten*, 865 F.3d 767, 777 (D.C. Cir. 2017) (finding that Court has jurisdiction pursuant to MEJA, and that venue was proper.)  For the reasons stated above, the Court concludes that Mr. Blount's limited facial challenge and as applied challenges, primarily focusing upon the jurisdictional element within underlying criminal statutes, fail.

## VI.    Conclusion

For the reasons explained above, Defendant Neal Robert Blount's Motion to Dismiss the Indictment (ECF No. 38) will be denied.  An appropriate Order will be entered.

Dated: <u>January 24, 2025</u>

Marilyn J. Horan
United States District Court Judge